# EXHIBIT A

```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF NEW YORK
 2

 3

 4   CHRISTINE SARACENI,
                                  Case No. 1:19-CV-1152
 5              Plaintiff,                    (LJV)

 6   vs.                          October 28, 2019

 7   M&T BANK CORPORATION,

 8              Defendant.

 9

10               TRANSCRIPT OF ORAL ARGUMENT
          BEFORE THE HONORABLE LAWRENCE J. VILARDO
11               UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:          HAGERTY & BRADY
13                         BY: DANIEL J. BRADY, ESQ.
                               MICHAEL A. BRADY, ESQ.
14                         69 Delaware Avenue
                           Suite 1010
15                         Buffalo, New York 14202
                           For the Plaintiff
16
                           HODGSON RUSS, LLP
17                         BY: JODYANN GALVIN, ESQ.
                               MARTHA M. PIGOTT, ESQ.
18                         140 Pearl Street
                           Buffalo, New York 14202
19                         For the Defendant

20   LAW CLERK:           REBECCA F. IZZO, ESQ.

21   DEPUTY CLERK:        COLLEEN M. DEMMA

22   COURT REPORTER:      ANN M. SAWYER, FCRR, RPR, CRR,
                          NYRCR, NYACR, Notary Public
23                        Robert H. Jackson Courthouse
                          2 Niagara Square
24                        Buffalo, New York 14202
                          Ann_Sawyer@nywd.uscourts.gov
25
```

```
 1                (Proceedings commenced at 2:01 p.m.)

 2                THE CLERK:  All rise.  United States District Court

 3     for the Western District of New York is now in session, the

 4     Honorable Lawrence J. Vilardo presiding.

 5                THE COURT:  Please be seated.

 6                THE CLERK:  19-CV-1152, Saraceni versus M&T Bank

 7     Corporation.

 8                Attorneys Daniel J. Brady and Michael A. Brady

 9     appearing on behalf of the plaintiff.

10                Attorneys Jodyann Galvin and Martha Pigott appearing

11     on behalf of the defendant.

12                This is the date set for an oral argument.

13                THE COURT:  Okay.  Why doesn't whoever is going to

14     argue come up to the respective podiums and we'll talk.

15                Good afternoon.  So let me ask Ms. Galvin first.  I

16     want to make sure that I have the universe of -- of documents

17     and the universe of issues, I have my head wrapped around

18     them.

19                So the emails that we're talking about or the lists

20     that we're talking about, there are five emails but really

21     four lists, right?

22                MS. GALVIN:  That's correct.

23                THE COURT:  Okay.  The first is a list that the

24     plaintiff claims was a potential customer, or something that

25     she prepared for M&T to send out when she started her
```

```
 1    employment, you know, a "guess where I'm working now, and come

 2    and get your mortgage from M&T."

 3            MS. GALVIN:  That's correct.

 4            THE COURT:  That's number one.

 5            MS. GALVIN:  That's marketing list.

 6            THE COURT:  Okay.  Number two is a list that looks

 7    like it may have been culled from that, that the plaintiff

 8    claims was a list of names that's -- that was a wedding

 9    invitation list.  But -- but the names and addresses on that

10    list appear to have come from the other list.

11            MS. GALVIN:  It appears to be a subset, Your Honor,

12    yes.

13            THE COURT:  A subset.  That's a much better way of

14    saying it, thank you.

15            The third list is a list of top attorneys and

16    accountants and investment advisors and things like that that

17    apparently was not prepared by the plaintiff herself, although

18    there seems to be some dispute about that.  I think the

19    plaintiff is saying that you don't really -- there's some

20    indication that it was prepared by somebody else and perhaps

21    revised by the plaintiff in your papers, but you don't really

22    make that point explicitly, and I think that the plaintiff is

23    calling you on that.  Do I have that correct, basically?

24            MS. GALVIN:  That's basically correct, Your Honor.

25            THE COURT:  Okay.
```

```
 1            MS. GALVIN:  We have a dispute about the substance of
 2   that list.
 3            THE COURT:  Okay.  And then the fourth list is the
 4   one that everybody agrees on, and that's the -- the -- I've
 5   forgotten what it's called.  It's the reverse.X1SX chairman's
 6   club list, and that includes some financial information,
 7   some -- some employee information with respect to the
 8   department where the plaintiff worked.
 9            MS. GALVIN:  That's correct.
10            THE COURT:  Okay.  That's the universe of documents
11   that we are talking about, and those are the universe of
12   violations that the plaintiff supposedly committed; is that
13   right?
14            MS. GALVIN:  That is the universe, Your Honor.
15            THE COURT:  Okay.  And let me ask you, Mr. Brady, the
16   harm that you're complaining about is simply -- all that M&T
17   did to your client was deny her her health insurance, and that
18   has since been reversed.  What we're talking about the health
19   insurance, and that's it, right?
20            MR. BRADY:  And, Judge, are we talking about the --
21   our motion for the preliminary injunction, or the motion to
22   seal.
23            THE COURT:  Well, I want -- I'm thinking about the
24   entire case.  What are your damages.  If you win this case,
25   what will you be entitled to in damage?
```

1          MR. BRADY:  She would be entitled to her health

2    insurance benefits, and --

3          THE COURT:  Through -- through November 22nd?

4          MR. BRADY:  Through November 22nd.

5          THE COURT:  Okay.

6          MR. BRADY:  Together with 18 months of coverage under

7    COBRA.

8          THE COURT:  COBRA, though, as I understand, she would

9    have to pay for that herself.

10          MR. BRADY:  Right.  But it would be administered

11    through M&T.

12          THE COURT:  Yep, okay.

13          MR. BRADY:  And her salary, 17 weeks of salary.  I

14    think there are some other benefits involved in the severance

15    pay program.  There's an employment assistance program, so

16    whatever the value of that would be.

17          THE COURT:  Okay.

18          MR. BRADY:  And --

19          THE COURT:  So there are -- there are other items of

20    damage besides --

21          MR. BRADY:  Right.

22          THE COURT:  -- the insurance.

23          MR. BRADY:  Right.  And as well as the statutory

24    penalties.

25          THE COURT:  Okay.  Yeah.  Okay.  So, now let's talk

Saraceni v M&T Bank - Oral Argument - 10/28/19

6

1    about -- so I think I have the -- the -- the universe of

2    issues in my head now, and that was the first thing I wanted

3    to clarify.

4         Let me ask you this, Mr. Brady.  If she prepares this

5    list for M&T to send to potential customers -- so, she's hired

6    by M&T.  And M&T says to her, put together a list of people

7    who you know who we should send a postcard to to try to get

8    their business, and she sits down and puts that list together.

9         Setting aside the confidentiality, which I have other

10   questions about, why isn't that M&T's property?  She prepared

11   the list while she was employed by M&T, presumably on M&T's

12   time.  Why isn't that list M&T's property?

13        MR. BRADY:  Right.  And I think to answer that, Your

14   Honor, the first point would be that there's actually no

15   evidence that that's what the list was prepared for.

16        THE COURT:  Isn't that what you say it was prepared

17   for?

18        MR. BRADY:  No, it was prepared to -- a list of

19   family and friends to send a look-who-joined postcard.  And

20   that's what we've described it as, and that's what M&T's

21   employee, Ms. Harrington, has described it as.  So there's

22   actually no evidence that it was submitted for an express

23   purpose of gaining these individuals' business.

24        THE COURT:  Why else would she send -- why else would

25   M&T want her to send a list -- send a postcard like that?

1      MR. BRADY:  I don't know, Your Honor.  M&T could

2  explain that.  But all they've said is it was sent to announce

3  her employment to friends and family.

4      THE COURT:  Well, regardless of the reason that they

5  sent it, if they asked her to put together a list for a

6  postcard that we would like to send out, regardless of whether

7  it means business for us or not, why isn't that -- and she

8  then prepares that while she's employed by M&T, presumably --

9  she was a salaried employee, right?

10     MR. BRADY:  Right.

11     THE COURT:  So presumably while she's being paid a

12 salary by M&T she is putting together this list, she does it

13 on an M&T computer and then it gets sent out to her family and

14 friends, who cares why M&T wanted her to do it?  Why isn't

15 that M&T's property?  She did it at the request of her

16 employer for whatever purpose her employer wanted her to do

17 it.

18     MR. BRADY:  Right.  And I think the answer would be,

19 Your Honor, that all we have to do is look to the cases and

20 what New York law is on what a protectable customer list is,

21 and --

22     THE COURT:  I'm not talking about protectable, I'm

23 not talking about confidentiality.  I think I may agree with

24 you on the question of confidentiality.

25     I'm asking why isn't that list -- so -- so now she

1   goes to a new employer, okay?  And the new employer says I'd

2   like you to do a list of friends and family that I'd like to

3   send a postcard of where I'm working now.  And she says oh,

4   I've got one already, it's on M&T -- she downloads that.

5           She can't do that.  That's M&T's list.  She can

6   prepare that list again, she can do exactly what she did for

7   M&T again and sit down and put together a list, and it can be

8   an identical list, which is why I have some issues with

9   respect to the confidentiality question.  But she doesn't get

10  to use that very list that she got paid by M&T for preparing,

11  right?  She can't take that list --

12          So, and let's go back to the days before computers.

13  She couldn't take that piece of paper that belonged to M&T,

14  that was -- that M&T paid for on the paper, and that M&T paid

15  for the typewriter ink that went on that paper, and that M&T

16  paid her to put that list together.  She can't take that paper

17  and go over to her new employer and give that paper to them.

18          So why can she download this list that's on a

19  computer that she -- that she prepared and got paid to prepare

20  by M&T?

21          MR. BRADY:  Well, I think that there's a couple

22  issues to address.  The first is there's been some kind of

23  argument about the ownership of the file itself.  And this is

24  in the record because there's actually been no opportunity to

25  put it in the record yet, but this is a Microsoft Excel

1   spreadsheet, and whether it's at Hagerty & Brady or on the

2   Court's computers or on M&T's computers or Hodgson Russ's

3   computers, Microsoft License licenses its software.  And it

4   says right in the licensing agreement you do not own this

5   software.  You have a license to use it, and you may be able

6   to own the information that's in it, but you do not own the

7   software.

8           So if the question is because M&T owned the

9   spreadsheet itself, it doesn't matter what the information is

10  in it, that's actually --

11          THE COURT:  But the -- but the information is in -- I

12  mean, I'm not a computer expert so I'm at a real disadvantage

13  here, but the information is electronically in the M&T system

14  on a Microsoft Excel spreadsheet.  It's not in the Hagerty &

15  Brady system.

16          I can't go into my Microsoft Excel and print the

17  plaintiff's list or M&T's list just because I have Excel.

18  There's a little electronic doohickey that's in the computer

19  that -- that is that list, right?  And that's in M&T's

20  computer.  It's not in Hagerty & Brady's computer, it's not in

21  the United States District Court's computer, and it's not in

22  your client's computer, it's in the M&T computer, that little

23  electronic doohickey, and that belongs to M&T, right?

24          MR. BRADY:  Well, I think the answer is that the only

25  thing that could belong to M&T is the information in that

1  list.  And --

2            THE COURT:  No.  The list belongs to M&T.

3            MR. BRADY:  But I -- Your Honor, that -- it can't.

4  It belongs to Microsoft.

5            THE COURT:  No, the software belongs to Microsoft.

6            MR. BRADY:  Right.  And the only -- so there are two

7  things making up the spreadsheet.  There's the underlying

8  software, and then there's the information that's on the

9  software.  Microsoft owns the software, and under state law,

10  nobody can own the information that's on that software because

11  it's publicly available.

12            THE COURT:  Well, you're right, they can't own the

13  information, but they can own the electronic doohickey that

14  includes the information that's on the software.  So I think

15  you're missing one part of the ownership here.  I think that

16  there's software, there is electronic information -- and,

17  again, I'm not a computer guy, but this is, you know, this is

18  a -- an old paper guy trying to figure out how -- how computer

19  stuff works.

20            So there's a -- there's software on the computer, and

21  there is an electronic version of information.  So you can't

22  own the information because the information is not in any kind

23  of electronic form, it's just out there.  Information is just

24  out there.  That's not -- that's not something -- that's not a

25  tangible something.  But there's a little piece of electronics

1   on the software that is the information.  That's what they

2   own.  Not the information itself, because, you're right, you

3   can't own information, you can go home and prepare that same

4   list.  But they can own that little piece of electronic

5   information, that little piece of electronics on which the

6   information is on the software that M&T has the ability to use

7   because they have the license from Microsoft.  Why am I wrong?

8        MR. BRADY:  I think that -- that -- I think we're

9   missing, Judge, that perhaps if she had interfered with M&T's

10   ability to access that file --

11        THE COURT:  She took it, she took it.

12        MR. BRADY:  It's analogous to -- but she didn't take

13   it, she sent a copy of it.  It's analogous to if she made a

14   Xerox copy of it.

15        THE COURT:  But I -- I'm going to agree with that,

16   yeah, it's analogous to her making a Xerox copy using the M&T

17   Xerox machine and the M&T paper and the ink and the Xerox

18   machine that M&T owned.  It's analogous to her taking that and

19   giving it to somebody else.  Yeah, I think I would agree that.

20   I think I would agree that.

21        And that's where you're losing me on why this doesn't

22   belong -- the list doesn't belong to M&T.  Again, not the

23   information, she can go home, sit down and do exactly for M&T

24   or do exactly for her new employer what she did for M&T, that

25   is, make this list up all over again.

1          What I don't think she can do is take the list and

2     give it to her new employer or give it to her husband's

3     employer or give it to whoever she wants.  That's -- that's

4     where you're losing me on this argument.

5          MR. BRADY:  Well I guess, Your Honor, I just -- I'm

6     not following, because there's really only two items that

7     could possibly be considered property.  One is the file

8     itself, which is a piece of Microsoft software.

9          THE COURT:  No.  I disagree with that.  The other one

10     is the information.

11          MR. BRADY:  And the other one --

12          THE COURT:  I think you're wrong.  I think you're

13     wrong.  I think there are three things.  There's the

14     information that's out there.  Then there is the Microsoft

15     software that without the information in it is just software,

16     it's a spreadsheet that has blank things in it.

17          Then you input this stuff into that stuff, and it

18     comes up with a list.  And that piece of electronics is the

19     third thing that you're trying to ignore.  And that's what I

20     think M&T owns.

21          MR. BRADY:  Your Honor, I'm not following how the

22     third thing is different from the information that's just

23     entered into the spreadsheet.

24          THE COURT:  Because information is a complete

25     intangible.  It's something that's out there.  It's something

1    that's in my head.

2            What's on the computer is different than what's in my

3    head, or in Ms. Pigott's head, or in your head, or in your

4    dad's head.  Information is out there.  Information -- there's

5    nothing tangible about information.  Information is out there.

6            The information becomes tangible when you make it

7    something electronic on the computer.

8            Information becomes tangible when I type it on a

9    piece of paper.

10            Information becomes tangible when I write on a piece

11    of paper.

12            These ideas on this piece of paper that I have in

13    front of me, that's the information.  That's not property.

14    But when I write it down, it sure as hell is.  And this is my

15    property.  This is mine.

16            MR. BRADY:  I agree, Your Honor.  And I think that

17    the distinction here is that as a matter of state law we say

18    that can be true, that information that you put into a

19    document can be a protectable property right of an employer.

20    But in this case, what cases say is if it's not -- if it's

21    something that's publicly available, if it's not the product

22    of years of hard work and time and expense, then it's not a

23    protect -- a property interest cannot arise in that

24    information.

25            And I think it's also important to point out that

1   what we're talking about is actually totally distinct from the

2   reason M&T gave for terminating her benefits.  And the

3   question under ERISA is was the reason incorrect, not can we

4   justify it after the fact.

5           THE COURT:  Okay.  Let me ask you this.  Your motion

6   for a preliminary junction is now moot, right?  They're

7   covering her through the end of November.  You say that you

8   haven't gotten the COBRA notice yet, if they send her the

9   COBRA notice and she gets to elect COBRA by the end of

10  November, your motion is moot, right?

11          MR. BRADY:  It's not, Your Honor.  Because when we

12  first came in, we brought a motion for a TRO to restore her

13  health insurance.  M&T said, or basically conceded the relief

14  said we'll restore it to September while we work this out.

15          Then we came in here again on September 11th, and the

16  agreement made on the record was that M&T would restore her

17  health insurance until possibly November 30th strictly to

18  allow briefing and decision on this motion.

19          So, if the Court denies the motion, then M&T will be

20  free to terminate her health insurance at any time.  And that

21  was the express agreement that the parties entered into on the

22  record.  So --

23          THE COURT:  If she gets her health insurance through

24  November 22nd, and gets her COBRA rights at November 22nd,

25  your motion for preliminary injunction will be moot, right?

1          MR. BRADY:  It actually wouldn't be, because her

2    COBRA notice should have been delivered some months ago and

3    she's still entitled under the law to --

4          THE COURT:  So what -- tell me what a preliminary

5    injunction would be.

6          MR. BRADY:  It would just be the restoration of her

7    health insurance benefits as they're --

8          THE COURT:  Which she has.

9          MR. BRADY:  Which she has, only subject to -- only to

10   allow briefing of this motion.

11         THE COURT:  No, no, no.  You're not answering my

12   question.

13         So I'm saying I reserve decision on the motion.

14   November 22nd comes and goes.  M&T, between now and

15   November 22nd, sends her a COBRA notice.  She then applies for

16   and gets COBRA.  As of November 23rd, your motion for a

17   preliminary injunction would then be moot.

18         MR. BRADY:  I guess so, Your Honor.

19         THE COURT:  Okay.

20         MR. BRADY:  But the reason we're here is because the

21   only reason the health insurance has been extended is to allow

22   briefing in this motion.

23         THE COURT:  I understand.  I understand.

24         Okay.  Tell me why this information is confidential.

25   I understand why -- I understand your argument that it's

1    proprietary.  Tell me why it's confidential.

2            MS. GALVIN:  Well, I'll start with the document that

3    Your Honor was focused on, marketing list, which is the Excel

4    spreadsheet of over 300 names.

5            That information is, in fact, confidential because it

6    was a compilation created for M&T's business purposes.

7    Together, as a whole, that list is a confidential list.

8            Each entry on its own?  Absolutely not.  We could

9    never take the position that Joe Brown's name and address is

10   somehow confidential information.

11           THE COURT:  But you agree with me, she can go and

12   compile that exact list tomorrow.

13           MS. GALVIN:  That's what happens, Your Honor, when

14   people want to take information from their current employers

15   when they leave.  They memorize things.  They go use the

16   phonebook.  They use Google.

17           Ms. Saraceni has shown this Court that she knows how

18   to use the library.  So she could very easily recreate it, and

19   there's nothing we can do to stop her.

20           THE COURT:  So, again, why is the list conf -- so,

21   again, I get the proprietary argument, I'm still not following

22   the confidential argument.

23           MS. GALVIN:  The confidential argument, Your Honor,

24   is based on the fact that there are M&T customers on that

25   list.

```
 1              THE COURT:  There are some, yeah.

 2              MS. GALVIN:  There are some.

 3              THE COURT:  Yes.

 4              MS. GALVIN:  There are some.

 5              THE COURT:  There are some that are not M&T

 6    customers.

 7              MS. GALVIN:  That's absolutely correct.

 8              THE COURT:  Okay.

 9              MS. GALVIN:  There's no dispute.

10              THE COURT:  So if I ordered the M&T customers to be

11    redacted from that list, would that -- would that satisfy you?

12              And they're not identified as M&T customers, are

13    they, on the list?

14              MS. GALVIN:  They are not.

15              THE COURT:  It's just a list.

16              MS. GALVIN:  They are not identified.

17              THE COURT:  So, again, I'm still not following -- I'm

18    not following -- you're losing me on this argument.

19              MS. GALVIN:  Yep.  Well --

20              THE COURT:  The confidentiality argument.

21              MS. GALVIN:  That's the basis of the argument, Your

22    Honor, is that the compilation, as a whole, is confidential

23    information that belongs to M&T.

24              THE COURT:  Okay.

25              MS. GALVIN:  But what really is key is belongs to
```

```
 1    M&T.
 2            THE COURT:  Proprietary.
 3            MS. GALVIN:  Yes.
 4            THE COURT:  Yeah, I understand that.  I get that.
 5            MS. GALVIN:  Yep.
 6            THE COURT:  I get that.
 7            Let's talk about the wedding list.  If that's really
 8    just a wedding list, if that subset of the big list is really
 9    just a list of people that she took from -- I mean, and it
10    seems like a reasonable thing to do.  I was talking with my
11    law clerks, and we did something very similar here when my
12    kids got married and -- and culled from a larger list, lists
13    of people who we wanted to invite to the wedding.  If that in
14    fact is the case, you don't think that is proprietary or
15    confidential, right?
16            MS. GALVIN:  Well, following your Your Honor's logic,
17    it would not be confidential.  I do think it's proprietary.
18            THE COURT:  Because she did it on M&T time
19    presumably?
20            MS. GALVIN:  She did it on M&T time.  She created --
21            THE COURT:  How do we know -- what if the facts come
22    out that she actually don't it on M&T time, that she probably
23    had access to her computer when she was home, right?
24            So she did it at home -- or, she stayed late one
25    night.  She stayed until 7:00 one night because her son or
```

1    daughter or whoever was getting married said, look it, Mom,

2    we've got to get this list together.  And she said okay, I've

3    got a good way to do it, I'll stay late at work tonight and do

4    it.

5         MS. GALVIN:  I don't think that helps the argument,

6    Your Honor, and the reason is --

7         THE COURT:  Why?

8         MS. GALVIN:  The reason is the information security

9    policy, which Ms. Saraceni was subject to and acknowledged,

10   that anything created on an M&T system belongs to M&T.

11        Now you could argue that there's a different value to

12   something like a wedding list, or a grocery list that you may

13   create on Microsoft word, or a list of appointments that you

14   have to attend to of a medical nature that you create on your

15   work computer.

16        But the bottom line is the policy of M&T is that that

17   belongs to M&T.  Now, would M&T necessarily enforce its policy

18   for something that's a wedding list?  Probably not.

19        THE COURT:  Okay.  Let's talk about -- do we all

20   agree that that list, the chairman's club reverse.X1SX or

21   whatever the heck it is list, do we all agree that that is

22   both proprietary and confidential?

23        That that is something that does belong to M&T and --

24   and that is confidential, as well?

25        MR. BRADY:  We agree that it should be sealed.  I

1    will note that there's no, despite the kind of blurry

2    approach, there's actually no allegation that she sent that to

3    anybody, just to herself.

4            THE COURT:  I understand that.

5            MR. BRADY:  Yeah.

6            THE COURT:  I get that.  But you would agree that

7    that list is M&T's property, and that that list is

8    confidential?

9            MR. BRADY:  That the information contained in there

10   is confidential, yes.

11           THE COURT:  The information contained in there is

12   confidential, and the list is M&T's property.

13           MR. BRADY:  I would agree that the information

14   contained in the list is M&T's property.

15           THE COURT:  Okay.  Okay.  I understand.  And you're

16   being careful because of the first set of questions that I

17   asked, and I get that, okay.  So that one, that part is easy

18   at least with respect to the sealing.

19           What about the -- the list of top lawyers and top

20   investment advisors and accountants and the like?

21           MR. BRADY:  Yeah.  And on this one, Judge, the first

22   question is, and I -- my first question is I'm not sure

23   what -- what motion we're referring to.

24           THE COURT:  So let's -- let's talk about the sealing

25   motion right now.

Saraceni v M&T Bank - Oral Argument - 10/28/19

1     MR. BRADY:  Okay.  On the question of sealing, my

2  first point would be rule 5.3 on showing a substantial showing

3  of evidence that necessitates sealing.  So, the first question

4  is what is the evidence.

5     And from M&T, we actually don't have any admissible

6  proof.  We have hearsay testimony from Ms. Harrington who

7  admits that she wasn't involved in the creation or use of the

8  document, and just says -- just kind of recites the elements

9  of a protectable customer list under New York State Law.

10     And we do have firsthand --

11     THE COURT:  But that's not a customer list.  That's

12  not a customer list.  I'm not talking about a customer list,

13  I'm not talking about the -- the spreadsheet.

14     MR. BRADY:  Right.

15     THE COURT:  I'm talking about the list of best

16  lawyers, best accountants, best investment advisors.  I forget

17  what the other things were on that list.

18     MR. BRADY:  Right.  And, Your Honor, with respect to

19  that list in particular, what I'm saying is that there

20  actually is no evidence submitted by M&T, admissible evidence,

21  about why that list needs to be protected.  All that we have

22  is hearsay testimony from Ms. Harrington.

23     And on the other side, we have testimony from my

24  client who has personal knowledge and says this is the list

25  that we use from publicly-available information.  And --

Saraceni v M&T Bank - Oral Argument - 10/28/19

22

1          THE COURT:  But so what if it -- I mean, there's a

2    lot of publicly-available information that becomes

3    confidential and custodial when people do things with that

4    information.

5          So, if I -- if I put together a list of law firms

6    that I -- that I use.  I have a company, and I go and I get

7    all sorts of public information, and I put together a list of

8    law firms that I use.  That is potentially confidential

9    information, isn't it?

10          If a competitor got ahold of that and knew that they

11   were going to be in litigation with me, a very wealthy and a

12   very smart competitor might immediately call every single one

13   of those law firms and conflict them out of representing me in

14   a case.  So that certainly is confidential information, even

15   though it all came from publicly-available stuff.

16          MR. BRADY:  Well, Your Honor, I'd say it depends on

17   what the cases say it depends.  And the 2nd Circuit says in

18   American Institute of Chemical Engineers v Reber-Friel, 682

19   F.2d 382, a customer list is not confidential where the past

20   or prospective customers are readily ascertainable from

21   sources outside the employer's business.

22          THE COURT:  This isn't a customer list, Mr. Brady.

23   This is a list of -- I'm talking about law firms now that I

24   use to represent me.

25          On this list that we're talking about, the one

1   document that I'm talking about right now are not customers,

2   they are vendors that M&T uses for accounting, for legal

3   representation, for money management, for things like that.

4          We're not talking about a customer list, so that case

5   that you're citing to me is inapposite.

6          MR. BRADY:  Well, Your Honor, I would say that --

7   that there's no evidence that M&T uses that list or those

8   firms for the reasons that you just said.  All we have is that

9   this list was used to send a postcard about where those

10  establishments may refer a potential client who is interested

11  in a reverse mortgage.  That's the only evidence there is.

12         So there's no evidence that M&T used these law firms,

13  used these money manager firms, and the -- the -- the point I

14  think we're all missing here, Judge, is that in order to be a

15  protectable trade secret or protectable customer list under

16  New York State law, something has to be the product of time

17  and expense that was tightly controlled within the business

18  that was used to do a specific thing.  And in this case, that

19  specific thing was selling reverse mortgages.

20         What is M&T not doing anymore?  Selling reverse

21  mortgages.

22         And we have an M&T's own submission, Exhibit E to the

23  Harrington declaration.  She sent out a letter to every

24  employee in the department with a list of other banks that

25  they should refer clients who get ahold of them to.

1        So the idea that M&T is being hurt because they're

2    still in this business, and now their documents are out there,

3    is just not consonant with reality because M&T 00100 is the

4    document, and we know from their own document, hey, if a

5    client gets ahold of you about a reverse mortgages, here are

6    these other places you should send them to.

7        So even if we -- so even if we accept that there

8    actually is some admissible proof of a protectable customer

9    list, which there isn't, even if there were, a customer list

10   would only be -- have been made to do one thing, and they're

11   not doing that anymore.

12       THE COURT:  Well, if it was a customer list that we

13   were talking about, we're not talking about a customer list, I

14   would agree with you.  But we're not talking about a customer

15   list.  We're talking about something completely different than

16   a customer list.  We're talking about, again, law firms,

17   accounting firms and the like, not a customer list.

18       Tell me -- tell me why the law firms and the customer

19   list is confidential.  Did I say customer list?  I meant law

20   firms.

21       MS. GALVIN:  I think it's called top firms.

22       THE COURT:  Yeah, top -- it's top firms in a number

23   of different areas, right?

24       MS. GALVIN:  Right.  Right.  There's brokerage firms,

25   insurance, law firms and accounting firms in that list.  And

1   Your Honor, as Ms. Harrington recited in her declaration,

2   these are firms where M&T would have strategic partnerships

3   with particular regional professionals.  This is just the

4   Rochester region that that list represents.  So --

5          THE COURT:  M&T would have strategic partnerships

6   with respect to reverse mortgages, or generally?

7          MS. GALVIN:  Generally speaking.

8          And as Ms. Saraceni recognizes, it was used for mail

9   merges to send out information to these particular contact

10  persons.

11         I think what's kind of being glossed over here, and

12  if I may take a minute here, Your Honor, Ms. Saraceni

13  represents that this was a direct copy of a publicly-available

14  document that she got from the library, and that's not

15  correct.  This is -- has unique changes that were made by M&T

16  personnel to suit M&T's business.

17         So it wasn't a wholesale copy job as she would like

18  this Court to believe.  It was, perhaps, assuming, we'll

19  credit her version of events that she used a

20  publicly-available source to begin the list on M&T time with

21  M&T resources, and then it was edited over time.  And there's

22  no explanation for those differences from Ms. Saraceni.

23         THE COURT:  Let me ask you, Mr. Brady, why can't I,

24  based on the representations of the defendant, find that these

25  are confidential business documents that will be sealed

1    pending the resolution of the factual issues that we're

2    talking about?

3            So -- so you say that this was a list that your

4    client copied from publicly-available information, M&T says

5    it's not.  M&T says it's confidential because these are its

6    go-to people for the Rochester region.  You say that's not so.

7            Why can't I seal these pending resolution of factual

8    issues that need to be resolved in order to decide whether

9    they are ultimately confidential?

10           So, similar to a trade secret case.  One side these

11   are trade secrets, the other side says are not, and the Court

12   says we're going to seal it pending the determination of the

13   factual issues to decide the litigation ultimately, whether

14   they're trade secrets or not, why shouldn't I do that?

15           MR. BRADY:  Well, Your Honor, the first point I would

16   make is just evidentiary.  The question is what does the

17   evidence say.  And with respect to Ms. Harrington's statement

18   about this document, it's not admissible evidence.  It's based

19   on hearsay.  And --

20           THE COURT:  And I can't take hearsay into account in

21   granting equitable relief like this?

22           MR. BRADY:  Well, under rule 5.3, the question is

23   substantial evidence, and --

24           THE COURT:  That's not my question.  My question is:

25   Can't I take hearsay evidence into account in granting

1   equitable relief?

2          MR. BRADY:  I -- I -- I don't see why this Court

3   should entertain hearsay evidence from M&T, particularly

4   when --

5          THE COURT:  Let me ask one more time.  Can I take

6   hearsay evidence into account in determining equitable relief?

7          MR. BRADY:  I don't know, Your Honor.  But one point

8   I would add is the M&T employee, Ruth DiVeronica, who

9   participated with my client in assembling this list in 2010,

10  and who emailed her the chairman's club, is still an M&T

11  employee.  We haven't heard from her.  There's no reason M&T

12  couldn't have gotten a declaration from her to explain the

13  contents of this list.

14         So I don't think the Court should make an exception

15  for hearsay testimony when there -- we've got declarations

16  from three M&T employees, and they couldn't find a single one

17  personal knowledge of the actual contents?

18         THE COURT:  Why don't we have somebody with personal

19  knowledge?

20         MS. GALVIN:  Your Honor, Ms. DiVeronica is a

21  secretary.  And, frankly, her conduct in providing

22  Ms. Saraceni with particularly the chairman's club is

23  questionable conduct.  And it was not appropriate at the time

24  that we were doing this last week to seek a sworn statement

25  from her when, frankly, we don't need to.  This isn't summary

Saraceni v M&T Bank - Oral Argument - 10/28/19

28

1     judgment.

2            And the standard that Ms. Saraceni would like this

3     Court to adopt, not admissible, not admissible, not

4     admissible, full and final, this is not a hearing on the

5     merits where everything has to be in perfect form.

6            The Desmeth case from the Southern District,

7     University of Texas, the Supreme Court, recognized the

8     incredible amount of flexibility the Court has at preliminary

9     injunction.  And the findings the Court makes at a preliminary

10    injunction hearing need not be binding on it later in a

11    proceeding, that the Court can reverse out and take a

12    different position once the merits have been fleshed out.

13           THE COURT:  Let's talk about your preliminary

14    injunction motion.  You want me to order her to return this

15    stuff to you, right?

16           MS. GALVIN:  Yes.

17           THE COURT:  That's the ultimate relief in this case,

18    too, isn't it?  I mean, shouldn't -- let me ask you this:  How

19    are you irreparably injured by her not returning this stuff to

20    you --

21           MS. GALVIN:  Well, what we have learned about

22    Ms. Saraceni is that she has flouted her obligations to M&T by

23    taking things when she was expressly instructed not to.

24           THE COURT:  Again, that's your view, and that's --

25    and this is what we're going to end up litigating in this

1    case.  But tell me -- tell me again how have you been

2    irreparably injured.  If you waited two months before you made

3    your motion for a preliminary injunction, tell me what is

4    going to change that will result in irreparable injury to M&T

5    if she doesn't return this stuff right away?

6            MS. GALVIN:  This information is in the hands of

7    M&T's competitor.

8            THE COURT:  But, again, the information --

9            MS. GALVIN:  The documents themselves, not the

10   information therein, the documents themselves.  And it would

11   put M&T in the position that it would have been had she abided

12   her obligations.  And frankly, there's no harm to her because

13   she says that it can all be recreated.

14           THE COURT:  Okay.

15           MR. BRADY:  And, Your Honor, if I could just

16   respond to the --

17           THE COURT:  Go ahead.

18           MR. BRADY:  -- to M&T's motion for preliminary

19   injunction.

20           THE COURT:  Yeah, please.

21           MR. BRADY:  I really don't think it's properly before

22   the Court.  It was brought without a pleading, and so under

23   Supreme Court precedent, it's jurisdictionally defective

24   because there's no basis for a preliminary injunction motion

25   if you don't have a pleading.  And we have prepared opposition

1  without knowing what the claims were.

2          And as far as the claims themselves, we are going to

3  be making a motion to dismiss because, for one, there's no

4  jurisdictional basis alleged in the counterclaims which is a

5  first requirement under rule 8.

6          For another, the breach of contract claim is plainly

7  subject to a preemption under ERISA.

8          And the breach of loyalty claim doesn't even come

9  close to the elements under New York State law for a breach of

10  loyalty claim.

11          So we have real objections to hearing a preliminary

12  injunction motion at this time, because we don't think there's

13  any basis for a likelihood of success on the merits of those

14  claims, and we will be filing a motion to dismiss.

15          THE COURT:  Okay.  So you don't think, even though

16  you respond -- I know you made your motion for an expedited

17  hearing, which -- which I think is now moot, isn't it?

18          MS. GALVIN:  I frankly don't know, Your Honor.  I

19  apologize.  There were so many schedules.

20          THE COURT:  So what you're saying you want more time

21  to move to dismiss their motion for a preliminarily

22  injunction, or to respond to their motion for a preliminary

23  injunction because you don't think I have jurisdiction over

24  it?

25          MR. BRADY:  Yes, Your Honor.  But I've also stated

1    that because the motion to expedite hasn't been ruled on yet,

2    there's no, you know, our time to respond to the motion can

3    still be pushed out a little further.

4            THE COURT:  Sure.

5            MR. BRADY:  And the other thing I would add, Your

6    Honor, that I think may help things all around is with respect

7    to these -- I think it's four other documents in addition to

8    the original list.  Those four other documents under ERISA

9    have no relevance to the ERISA claim.

10            So if they are -- if M&T's counterclaims are

11    dismissed, then they really have no relevance in this case at

12    all, and that would pretty much make the sealing issue

13    entirely moot.

14            THE COURT:  Yeah, I was going to say the sealing

15    issue goes away, doesn't it?

16            MR. BRADY:  Yes, it does.

17            THE COURT:  Okay.  How much time do you need to --

18    the motion for the expedited schedule is going to be denied.

19            MS. GALVIN:  That's fine.

20            THE COURT:  If it's not moot, it's going to be

21    denied.

22            MS. GALVIN:  That's fine.  We'll amend our cross --

23    our counterclaims.

24            THE COURT:  So you want to do that first?

25            MS. GALVIN:  We'll do that first.

1          THE COURT:  How much time?

2          MS. GALVIN:  A week.

3          THE COURT:  A week.  Colleen, please?

4          THE CLERK:  That's November 4th.

5          THE COURT:  November 4th.

6          How much time do you want to make your motion to

7    dismiss or respond to that?

8          MR. BRADY:  I think two weeks is probably sufficient.

9          THE COURT:  November 18th.

10         THE CLERK:  November 18th.

11         THE COURT:  And reply, November -- yeah, we don't

12   have Thanksgiving -- the 25th, because Thanksgiving is late

13   this year?

14         MS. GALVIN:  Yes, that's fine.  Thank you.

15         THE COURT:  Great.  And if I need oral argument, I

16   will ask for oral argument.

17         The plaintiff's motion for a preliminary injunction

18   I'm reserving on because I think that that is going to become

19   moot.  If -- if you have need to send a COBRA notice, please

20   send a COBRA notice.

21         MS. GALVIN:  Your Honor, if I might, just to clarify

22   the record because I didn't really have a chance to address

23   plaintiff's motion?

24         THE COURT:  Yeah.

25         MS. GALVIN:  Very briefly, we don't think there's a

1   controversy for the Court to hear given the extension of the

2   health care benefits through -- it's actually the end of

3   November that M&T agreed to.

4          So the two cases of relief that Ms. Saraceni was

5   seeking was that extension without the threat of a recoupment

6   by M&T, which I don't think is something the Court can award,

7   and I don't know what that means, really.

8          But, the second was issuance of a proper COBRA

9   notice.  Well, Ms. Saraceni, by virtue of M&T reinstating the

10  day after she sued, no longer has a qualifying event until the

11  end of November at which time the COBRA notice will issue,

12  because --

13         THE COURT:  Oh, is that right?  You don't send a

14  COBRA notice until -- well, you have to send her a COBRA

15  notice sometime before the policy expires, do you?  So that

16  she then knows --

17         MS. GALVIN:  No.

18         THE COURT:  -- what to do?  No?

19         MS. GALVIN:  No.  What's required of an employer is

20  to give an upfront COBRA notice when somebody is onboarded

21  into a corporation or company that offers benefit packages.

22  Then, after a qualifying event, let's say termination of

23  employment, that qualifying event, someone like M&T has

24  44 days to issue a COBRA notice.

25         THE COURT:  And what happens in that 44-day period,

```
 1   if I get -- so --
 2           MS. GALVIN:  The coverage is lapsed and then
 3   reinstated as soon as the person elects COBRA.  So it's much
 4   like what happened here, that the claimed harm that happened
 5   in August where medical benefit was denied is just cleaned up.
 6   That's how COBRA works.
 7           THE COURT:  Is she right?
 8           MR. BRADY:  Respectfully, no, Your Honor.
 9           And COBRA, the COBRA law and regulations are --
10   there's a lot of them, but they're very specific.  And a
11   qualifying event -- the only qualifying event at issue here is
12   termination of employment.
13           End of severance benefits is not a qualifying event
14   under COBRA under the regulations.  It's just not one that's
15   defined.
16           And they actually express out in the regulations,
17   they give an example of an employee who has a severance
18   package.  And the question is when is the qualifying event?
19   The qualifying event is the end of employment.
20           So under the regulations, there's kind of no wiggle
21   room.  The qualifying event was July 26th, 2019.  That was
22   when they required to give notice.
23           THE COURT:  Is there any reason for M&T not to send
24   her a notice now?
25           MS. GALVIN:  We will do that, Your Honor.
```

1          THE COURT:  Thank you.

2          So, I fully expect the plaintiff's motion for a

3  preliminary injunction to become moot on November 22nd or

4  November 30 -- I mean, you've extended it to November 30th,

5  right?  I think --

6          MS. GALVIN:  I think that was accommodate briefing

7  and the Court's consideration and decision.

8          THE COURT:  Yeah, but we have extended it until

9  November 30th.

10          MS. GALVIN:  Yes.

11          THE COURT:  Yes.  So I think as of the 22nd, at

12  least, and certainly as of the 30th, once she gets that COBRA

13  notice, which I fully expect her to get before then,

14  plaintiff's motion for a preliminary injunction will become

15  moot.  If that's not the case, then you folks can let me know.

16          But I'm going to reserve on the plaintiff's motion

17  for a preliminary injunction.  I'm going to reserve on the

18  sealing issue, and keep the sealing in place right now until I

19  resolve that.

20          And then we've got a briefing schedule with respect

21  to the defendant's motion for a preliminary injunction.

22          Anything else we need to do this afternoon?

23          MS. GALVIN:  Not from M&T's perspective.

24          MR. BRADY:  No, Your Honor.

25          THE COURT:  Okay.  Thank you, all, very much.

1           MS. GALVIN:  Thank you.

2           MR. BRADY:  Thank you, Judge.

3           (Proceedings concluded at 2:47 p.m.)

4           *    *    *    *    *    *    *    *    *    *

5

6

7

8

9

10

11

12

13

14

15

16                        **CERTIFICATION**

17

18               I certify that the foregoing is a

19          correct transcription of the proceedings

20          recorded by me in this matter.

21

22                         s/ Ann M. Sawyer
                           Ann M. Sawyer, FCRR, RPR, CRR,
23                         NYRCR, NYACR, Notary Public
                           Official Reporter
24                         U.S.D.C., W.D.N.Y.

25